UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| NVIDIA CORPORATION, | ) | |
| | ) | Civil Action No. |
| Plaintiff, | ) | 1:08-CV-473 |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| RAMBUS, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

Plaintiff NVIDIA Corporation, upon personal knowledge as to itself and upon
information and belief as to all other matters, by and through its undersigned attorneys,
brings this complaint against Defendant Rambus, Inc. and its agents, and in support
thereof hereby alleges as follows:

## INTRODUCTION

1.      This action arises from Rambus Inc.'s ("Rambus" or "Defendant")
anticompetitive acts and practices whereby Rambus, through deliberate and intentional
means, shoplifted an industry standard relating to the manufacture of common forms of
dynamic random access memory ("DRAM") with the intent of engaging in
monopolistic conduct with regard to DRAM technologies.  By putting together a
memory architecture portfolio and purposefully withholding information regarding the
scope of its patents from the relevant standard setting organizations, Rambus
affirmatively acted to anticompetitively bias the DRAM standard-setting process and,
subsequently, illegitimately profit from technologies over which it now claims patent

rights, patents that are incorporated in over 90% of the DRAMs sold in the United States and worldwide.  NVIDIA seeks to put these illicit gains to an end and to prevent further victimization that has occurred as a direct result of Rambus' acquisition of monopoly power.

2.      Rambus first implemented its scheme by becoming a member of the Joint Electronics Devices Engineering Counsel ("JEDEC")—the highest standards setting organization of the industry—in the early 1990s.  JEDEC's purpose is to influence and monitor the evolution, development and adoption of industry standards for Synchronous DRAM ("SDRAM").

3.      Rambus, as a member of JEDEC, encouraged the standards body to adopt as the de facto industry standard what it believed to be the future for memory interface technologies, a technology it called Rambus DRAM ("RDRAM").

4.      To help ensure that its vision was brought into being, Rambus used its membership in JEDEC as a platform from which to slow the development of competing memory standards and to block competing technologies that threatened what Rambus saw as its opportunity to establish RDRAM as an industry standard.

5.      When RDRAM failed to become the industry standard, Rambus set another plan in motion that it hoped would guarantee huge profits in spite of its failed bid for industry standard status.  By abusing the knowledge gleaned through its JEDEC membership, Rambus began expanding its patent portfolio to include patents that covered various SDRAM technologies, thus ensuring that Rambus patents would remain profitable even if Rambus technologies were not industry standards.

6.      Rambus actively participated in JEDEC's standard setting proceedings and engaged in a pattern of bad-faith, deceptive conduct, which was exclusionary in nature and calculated to undermine competition and cause harm to manufacturers who purchased DRAM technology.  Through its knowing and willful omission about its ownership of various patents and other instances of bad faith and deceptive conduct, Rambus created and maintained the materially false and misleading impression that it did not possess, nor would enforce, any relevant intellectual property rights which could undermine JEDEC standards.

7.      Rambus maintained its silences and spun its illusion of disinterest with regard to the memory standards until the industry was "locked into" the technology, at which point Rambus broke its self-imposed to silence to assert its claims in its heretofore unannounced patents and to leverage such ownership for its own immense profit.

8.      These false impressions proved to be exceedingly harmful; indeed, Rambus's acts of deception constitute exclusionary conduct under Section 2 of the Sherman Act, and demonstrate that Rambus unlawfully monopolized the markets for four technologies incorporated into the JEDEC standards.  Further, such exclusionary conduct subverted the standard-setting process and lead to Rambus' acquisition of monopoly power, thus neutralizing the pro-competitive benefits of standard setting processes generally and the JEDEC organization in particular.

9.      Rambus also engaged in a concerted document destruction program to cover its tracks.  Indeed, Rambus's document destruction plan and its subsequent

systematic obliteration of incriminating documents constituted an integral part of its forced licensing plot.

10.    Rambus' anticompetitive scheme has allowed it to unlawfully coerce semiconductor companies into a variety of agreements in restraint of trade pertaining to the licensing of DRAM technology and its more recent progeny.  As a direct and foreseeable result, Plaintiff NVIDIA has been injured by being denied a true and competitive choice of DRAM technology and has been forced to pay supracompetitive prices for SDRAM and SDRAM descended technologies which it must use for the manufacture of graphics processors units, including in personal computers, video devices and memory chips.

11.    Since the implementation of this scheme, Rambus has expanded its licensing net to include semiconductor companies, including NVIDIA; indeed, on July 10, 2008, alleging patent infringement, Rambus sued NVIDIA in the Northern District of California.  Rambus is now engaged in a continuous "patent shakedown" of semiconductor manufacturers by deploying extortionate licensing schemes based on the "progeny" of the original and fraudulently obtained "parent" patent, thus causing the prices of memory to rise.

12.    The artificially inflated rise in memory architecture prices has adversely affected NVIDIA as an intermediate purchaser of SDRAMS and DDR SDRAMS. NVIDIA has and will continue to face supracompetitive prices for its purchases of SDRAM, DDR SDRAM, DDR2 SDRAM, DDR3 SDRAM and XDR technology or be

unlawfully coerced into a variety of agreements in restraint of trade pertaining to the licensing of certain DRAM technologies.

## JURISDICTION AND VENUE

13.     This action arises under 15 U.S.C. §§ 4 and 26; N.C. GEN. STAT. ANN. § 75-2 (2006); and N.C. GEN. STAT. ANN. § 75-1.1(a) (2006).

14.     Jurisdiction is conferred on this court pursuant to 28 U.S.C. § 1337; 28 U.S.C. § 1338(a) and 28 U.S.C. § 1367.

15.     Rambus is subject to jurisdiction in the State of North Carolina because it maintains an office located at 1512 East Franklin Street, Suite 200, Chapel Hill, NC 27514.  Rambus has registered with the North Carolina Secretary of State to conduct business in this state.

16.     Venue is properly founded in this Court under 28 U.S.C. §§ 1391(b)(2), 1391(c) and § 1400.

## PARTIES

### I.     PLAINTIFF

17.     NVIDIA is a Delaware corporation whose headquarters are located at 2701 San Tomas Expressway, Santa Clara, California.  NVIDIA also maintains an office at 2700 Meridian Pkwy, Suite 100, Durham, North Carolina, 27713.  NVIDIA engages in numerous activities in this office, including research and development of its graphics processing units ("GPUs").

18.     NVIDIA creates various products for computing, consumer electronics and mobile devices.  NVIDIA specializes in the worldwide production of

5

programmable graphics processor technologies and is a customer and developer of systems and complementary components that incorporate DRAM technology.  It offers products under four groups:  (1) GPUs, a technology primarily used in workstations, desktop computers, and handheld devices; (2) media and communications processors ("MCPs"); (3) handheld GPUs; and (4) consumer electronics.  NVIDIA is also a major supplier of integrated circuits ("ICs") for personal computer motherboard chipsets and game consoles.

19.    NVIDIA products utilize and incorporate semiconductor memory devices, including SDRAM, DDR SDRAM, and RDRAM technologies created by and purchased from third parties, including companies with licenses from Rambus.

## II.    DEFENDANT

20.    Upon information and belief, Rambus is a Delaware corporation with its principal place of business at 4440 El Camino Real, Los Altos, California.  Upon information and belief, Rambus also maintains an office at 1512 East Franklin Street, Suite 200, Chapel Hill, North Carolina.

21.    Rambus, by contrast with NVIDIA, is a semiconductor company focused primarily on creating GPUs and does not manufacture or sell GPU devices or ICs. Rather, Rambus purports to design, develop, license and market high-speed memory technologies that enhance the performance of computers, consumer electronics, and communications systems to companies that manufacture semiconductor memory devices.

22.     Rambus does not manufacture memory devices for resale.  Rather,

Rambus derives its revenues from licensing fees, development fees such as non-

recurring engineering fees, and royalties.

## SUBSTANTIVE FACTUAL ALLEGATIONS

### Background

### The Technology of the Semiconductor Computer Chip Industry

23.     A computer's "memory" functions to store digitally recorded information

such that it is available to be accessed when needed by the computer's central

processing unit ("CPU"), which serves as the computer's "brain."  A GPU is a highly

specialized form of the CPU used for graphics in computers.

24.     The CPU, as well as other important computer components, consists of

integrated circuits that hold temporary instructions and data in the form of

semiconductor "chips."  These chips are connected through a collection of circuit lines

called a "bus," which communicate, command and transport memory data throughout

the computer or other electronic device.  These fundamental chips are often referred to

as "random access memory", or RAM.

25.     Most types of RAM chips lose all data when the power is turned off and

the system shuts down.  Accordingly, the chips "leak" memory as the electronic charges

they receive dissipate.  To counteract this phenomenon, RAM memory chips must be

constantly "refreshed" with new electronic pulses.  Accordingly, most computers use a

type of RAM known as dynamic random access memory, or DRAM, which, through

continuous electronic pulses, hold the stored information in place over time.

26.     DRAM is the dominant form of memory chip employed in the semiconductor industry today.  DRAM technology is an essential component in a wide variety of personal computers, work stations and servers.  It is also found in various electronic products, including fax machines, printers, digital video recorders, video game equipment and handheld portable devices.  Total sales of DRAM in the United States exceeded $12 billion in 2000, and for the same year worldwide, DRAM sales exceeded $28 billion.

27.     As the DRAM technology evolved, different architectures for DRAM chips incorporated features that dramatically improved performance.

28.     Synchronous DRAM ("SDRAM") chips are a high-speed, high-performance subset of DRAM chips that provide for faster and more efficient overall computer system performance by linking memory functions to a "system clock" that, in effect, consists of a continuous series of evenly spaced electronic pulses called a "clock cycle."

29.     Throughout the late 1990s through 2001, SDRAM dominated the market.  SDRAM gradually replaced DRAM as the most common architecture used in mainstream computers.  The first generation of SDRAM accounted for roughly 85.7% of all DRAM sales in 1999 and 77.8% in 2000.

**Integrating the Technology**

30.     In order for a computer hardware to properly function, it must seamlessly integrate the many different components that create a "motherboard", i.e., the main circuit board upon which important components of a computer system are fastened.

31.     Because there are so many moving parts to a working motherboard, logic and DRAM chips (as well as all other circuits to a computer) must be compatible; that is, the SDRAM, logic chips and all the other integral devices must be designed with a common interface so that they can function together as a seamless whole.

32.     In order to ensure compatibility, the semiconductor industry has adopted a variety of technical standards relating to the structure and functionality of SDRAM.  To achieve compatibility, DRAM manufacturers and other industry participants standardize the various architectures and technologies through open forums.  These standards serve the pro-competitive purpose of allowing many different manufacturers to compete with respect to chips and memory by providing a common set of ground rules that allow the devices to interoperate.

33.     This standardization process also ensures that even as the technology progresses and becomes more modern, it will continue to function seamlessly with motherboards and other technological infrastructures that may or may not be as cutting edge.  To ensure the compatibility of older parts with new parts, the newer parts need to be compatible with older designs.  In this way, backward compatibility is essential.  If a newer design does not support the older generations of requirements, a computer simply will not work.

**The Industry Standard-Setting Process for DRAM Technology**

34.     JEDEC is the semiconductor engineering standardization body of the Electronic Industries Association ("EIA"), and is responsible for developing and publishing configuration standards for semiconductor device packages.  JEDEC is the

leading developer of standards for the solid-state industry.  The publications and standards that they generate are accepted throughout the world.

35.    JEDEC membership is available to any company, organization, or individual conducting business in the U.S. that manufactures electronic equipment or electronics-related products, or provides electronics-related services.  All members, however, must be capable of making a technical contribution to the standards-setting process. Many companies who implement the JEDEC standards are not members. However, those companies rely on the open and procompetitive nature of the JEDEC standards and expect that the standards are free of encumbrances, such as patents, caused by the JEDEC members.

**JEDEC's Role as a Standards Setting Body**

36.    JEDEC's primary function is "to promote the development and standardization of terms, definitions, product characterization . . . manufacturing support functions and mechanical standards for solid state products."

37.    JEDEC develops and maintains the standardization process through 50 committees organized by subject matter.  About 270 member companies and 2,700 individuals actively participate on these committees to develop and maintain standards to meet industry and user needs for semiconductor devices and integrated circuits. These member companies include both manufacturers and users of these products, and other individuals or organizations who are somehow allied to the field.

38.    One of JEDEC's goals is to develop industry-wide technical standards for memory chips to ensure that new and different DRAM technologies will be compatible

with each DRAM manufacturer's architecture.  Among the standards promulgated by JEDEC were those standards relating to SDRAM technology.

**JEDEC's Dedication to Free Competition**

39.     JEDEC is, and has been through all relevant times herein, committed to ensuring free competition among its members and all interested parties with regard to the technology that it surveys.  Indeed, JEDEC's Manual of Organization and Procedure states:  "The Association and its members are committed to <u>foster open competition</u> in the development of products and services . . . The mission of JEDEC is to serve the solid state industry by creating, publishing, and promoting global acceptance of standards, and by providing a forum for technical exchange on leading industry topics."  Accordingly, JEDEC forbids activities or programs relating to anticompetitive conduct through pricing and trade agreements in restraint of trade.

40.     JEDEC's legal guide states as a basic rule with regard to its standardization programs that no program "shall . . . involve any agreement, expressed or implied, to adhere, or require adherence to a standard or the use of any coercion, directly or indirectly . . ." and that the programs "not be proposed for or indirectly result in effectuation of a price fixing arrangement [or] restricting competition."

41.     Consistent with its commitment to free competition, at all times relevant herein, JEDEC has also maintained a commitment to avoid the incorporation of patented technologies into its published standards.  Thus, any standard calling for the use of a patented item or process could not be considered by a JEDEC committee unless the patent or pending patent was "known to the committee, subcommittee, or working

group." Once known, the patent holder was required to inform the committee Chairperson in writing that a license to use the patent was available either (a) "without charge to applicants desiring to use the patent for the purpose of implementing the standard(s)"; or (b) under reasonable terms and conditions that are demonstrably free of any unfair discrimination."

42.     JEDEC's policies governing the disclosure of patents and applications were formulated to prevent a single company from secretly capturing the industry standard, and to prevent an unscrupulous member from manipulating the standards-setting process to its individual advantage so it could extract unreasonable and discriminatory royalties, or "hold up", those who manufacture products required to be compatible with the standard.

43.     JEDEC's "duty to disclose" policy is and was, at all relevant times, strictly applicable to all JEDEC member companies who expected to, at any time, enforce patent rights against the standard.  Should no such desire to enforce or assert a patent exist, there was no need to disclose such ownership.

44.     These policies and requirements were commonly known throughout the entirety of Rambus' involvement with JEDEC.  Indeed, when Rambus joined JEDEC, JEDEC's disclosure requirements were already the object of a well-publicized litigation between two JEDEC members, Wang Laboratories, Inc. ("Wang") and Mitsubishi, based on Wang's failure to disclose pending patent applications relating to standard-setting work undertaken by JEDEC and Wang's subsequent assertion of resulting patents against products compliant with the standard.

45.     Additionally, JEDEC informed participants of their obligations under the patent policy through discussions at JEDEC meetings, manuals, minutes, ballots, the JEDEC sign-in sheet, and advice from John Kelly, a Chairman at JEDEC.  Thus, Rambus and its agents who participated in JEDEC's standard setting process on its behalf were fully aware of JEDEC's Disclosure Policy Requirements.

**JEDEC's Standardization of SDRAM Technology**

46.     JEDEC's standards are typically proposed, evaluated, and formulated at committee or subcommittee levels and are then presented for approval to the Board of Directors, which has the final authority to approve or disapprove all proposed standards.

47.     Within JEDEC, the committee responsible for developing standards relating to memory devices is called the "JC-42 Committee on Solid State Memories" ("JC-42").  The JC-42 is comprised of several subcommittees.  For purposes of this complaint, the key subcommittee was the JC-42.3 Subcommittee on RAM Devices ("JC-42.3").  JC-42.3 develops many of the predominant standards relating to DRAM products.

48.     Beginning in or around 1990, JC-42.3 began work on standards relating to the design and architecture of SDRAM.  During the 1990s, JEDEC issued several SDRAM-related standards.  In August 1999, JEDEC published a substantially augmented SDRAM standard, which introduced a second generation of SDRAM.  This second generation standard became known as "double data rate" or DDR SDRAM."

**The JEDEC SDRAM Standard**

49. The DDR SDRAM standard was based on the traditional wide-bus, non-packetized DRAM architecture, and relied upon non-proprietary technologies. DDR1 transfers information at a rate double the SDRAM standard. DDR2 SDRAM, although containing virtually all of the same features found in its predecessor, DDR1, supports an external clock that runs at a higher clock frequency than that of DDR, which permits an improved rate of data transfer as compared to the DDR SDRAM standard. In June 2001, JEDEC began work on a DDR3 standard. DDR3, which also contains virtually all the same features found in DDR2, features a clock that runs on an even higher frequency than that of DDR2. Each subsequent version of DDR must be compatible with the earlier versions.

Backward Compatibility

50. There are typically three evolutionary classes of memory interface standardization activities in progress at JEDEC at any given time: one to support and expand the specifications for DRAM in its current incarnation; a second one to develop the standards for the next DRAM permutation; and a third form to develop yet another successor. By way of example, in April 1998, a Future DRAM Task Group began work that culminated in the development of the standard for DDR2 SDRAM. In June 2001, that Task Group was reconstituted to start work on DDR3 SDRAM.

51. This evolutionary approach to standardization maintains "backward compatibility"; an idea that allows previously developed infrastructure, features and protocols from older technologies to be reused to the greatest extent possible and

currently existing features or functionality to be maintained.  Each generation of

DRAM forms the base for the next generation.

52.     Accordingly, backward compatibility has been a key component in

virtually every standard memory as it simplifies the learning curves of the DRAM

manufacturer and user communities and eases transitions from one memory generation

to the next while allowing evolutionary memory architectures to co-exist in the market.

The differences between SDRAM, DDR SDRAM, DDR2 SDRAM and DDR3

SDRAM are, thus, intentionally relatively small.

53.     An additional feature of the evolutionary class of memory development is

that once a feature is included in a commodity DRAM standard and the infrastructure is

developed to take fullest advantage of a feature, it can become very difficult to remove

the feature.  The removal of a feature creates a new standard without a previously used

feature; implementation and adoption of a new standard would require modifications of

corresponding industry infrastructure, an issue that would cause complete chaos for

manufacturers of the various equipment that incorporates the technologies.

54.     NVIDIA has built its company based upon making its GPUs compatible

with memory devices.  The only means by which NVIDIA can create compatible

memory devices is by complying with the JEDEC standard and relying upon the open

nature of that standard.

55.     During the relevant period, the process for JC-42.3's adoption and

publication of standards was as follows:

- At regularly scheduled meetings, JC-42.3 members were allowed to make presentations concerning specific concepts or technologies they proposed for inclusion in any given standard under development.

- Such presentations were generally accompanied by written materials, which, in addition to being shared with all members present at the meeting, were reproduced and attached to meeting minutes.

- Before any proposal could be considered for adoption, such proposal was presented a second time at a later subcommittee meeting.

- At the second presentation, a member could move for approval of the proposal through a formal ballot process.  The ballots uniformly contained the following language:  "[i]f anyone receiving this ballot is aware of patents involving this ballot, please alert the committee according to your voting response."

- Votes were then tabulated at the subsequent meeting of the subcommittee, at which time members voting "No" were required to explain their opposition.

- While a two-thirds majority was technically required, proposals rarely passed without a consensus of all voting members.

- Individual proposals, once approved by JC-42.3, were often held at the subcommittee level until a complete package of related proposals were ready to be sent to the Council for final ratification.

- After a subcommittee approved a standard, the proposed standard was sent by ballot to the JEDEC Board of Directors.  The Board of Directors, in turn, voted

on the proposal.  To become a JEDEC standard, a majority of the Board of

Directors had to approve the standard.

56.     A member's participation in a JC-42.3 committee meeting, therefore,

allowed the member to have almost unlimited access to matter concerning the

development of SDRAM technologies, which would soon be announced to be the

industry standards voted on by committee members.

**Rambus' RDRAM Technology**

57.     RDRAM was a technology designed by Rambus and produced by

Rambus licensees in accordance with Rambus' "architecture."

58.     In its original permutation, RDRAM differed from traditional

architectures in several ways:  (1) RDRAM architecture specified the use of fewer bus

lines than in traditional DRAM designs, and is thus considered to be "narrow-bus"

architecture; (2) in RDRAM architecture, each bus line was capable of carrying three

types of information essential to memory:  (a) data; (b) "address" information, and (c)

control information, designated as "multiplexed" technology, whereas traditionally bus

lines could only carry a single strand; and (3) RDRAM was capable of transmitting

data, address and control information in groupings called "packets," whereas traditional

DRAM software could only deliver the information singly.

59.     Rambus promoted RDRAM throughout the 1990s and early 2000s.

During this time, Rambus made presentations, circulated marketing materials, and

approached prospective licensees in an effort to establish RDRAM as the dominant

memory design of the future.

60.     One of the main inventors of RDRAM, Paul Farmwald, came to the idea of RDRAM while employed at MIPS Computer Systems ("MIPS") in 1988, at which time urgency in the industry had began to grow around solving the bottleneck problem plaguing modern memory chips; namely, that there were no memory products that performed fast enough to keep up with the development of high speed CPUs.  Rambus would eventually create RDRAM (a final version, non-bottleneck memory technology) to address the issue around the same time as the filing of Rambus's '898 application. See ¶ 63, infra.

61.     Even though the technology was desirable, many industry participants balked at the royalties associated with RDRAM and considered them to be a drawback relative to SDRAM and DDR technologies which were viewed as being "open standards" (i.e. technologies that the industry felt were not covered by Rambus patents) or without royalties.  In addition, many of the technical restrictions that moved in tandem to RDRAM technology made it less desirable than the competing SDRAM or DDR solutions.

62.     Rambus, in response, joined JEDEC to slow down the development of the SDRAM competing standard and to situate itself so as to be able to block SDRAM technology as a standard if the RDRAM technology grew less successful.  Rambus' JEDEC membership became part of a well-crafted "back-up" patent strategy that maximized Rambus' leverage even as its RDRAM technology lost some of its prominence.

18

**Rambus' '898 Patent Application and Its Progeny**

63.     On April 18, 1990, Rambus filed its first DRAM-related patent application with the PTO – Application No. 07/510,898 (hereinafter, "the '898 application").  The application contained a 62-page specification and 15 drawings, all purporting to describe RDRAM-related inventions.  The application also contained 150 separate claims, each of which was limited to a narrow-bus, multiplexed, packetized DRAM design.

64.     Two years later, in March 1992, Rambus broke out portions of its '898 application into 10 divisional patent applications, each of which purported to "claim priority back" to the original '898 application and its April 1990 filing date.  These combined patents eventually resulted in dozens of patents, all purportedly based on the '898 application, being issued, including the technologies for programmable CAS latency and burst length technologies, as well as those for on-chip phase lock and delay lock loops (on chip "PLL/DLL").

65.     Over time Rambus continued to expand the claims contained within these applications in order to obtain patent rights extending beyond the narrow-bus, multiplexed, packetized design inherent in the RDRAM design while attempting to cling to the '898 application's April 1990 priority date.

**Rambus' Fraud on JEDEC**

66.     Rambus joined JEDEC as a committee member in December 1991.  At or around the time that Rambus began to participate in JEDEC, JEDEC members were in the process of developing a first generation of standards for SDRAM, including an

interface technology standard.  In developing that standard, JEDEC members discussed, in open meetings, interface technology features such as external and internal clocking, mode registers, latency, and storable burst.  Rambus was present at, and participated in, those meetings.

67.     During the JC 42.3 committee meetings, matters concerning the development of synchronous DRAM technologies, later to be announced as the industry-standard SDRAM and DDR, were voted on by members by way of a ballot. These ballots contained the following language:  "If anyone receiving this ballot is aware of patents involving this ballot, please alert the Committee according to your voting response."

Rambus' Behavior as a Member of JEDEC

68.     Almost immediately upon joining, Rambus began to use the various JEDEC sub-committee forums to promote its RDRAM technologies in hopes that it would be adopted as the industry standard.  Rambus hoped to see any efforts at adopting an industry-wide SDRAM standard fail, inasmuch as industry adoption of such a standard would make it more difficult for Rambus to incorporate RDRAM as the dominant technology.

69.     Rambus engineer William Garrett represented Rambus at its first JEDEC meeting.  Garrett immediately reported back to his supervisors that SDRAM standardization would be established by JEDEC sooner than expected.  In response, Rambus formulated an alternate business plan, one wherein even should the RDRAM

standardization fail, Rambus would continue to profit through charging exorbitant

royalties for the use of SDRAM technology.

70.     Notably, around this period, Rambus began to alter its patents.  Rather

than claiming its inventions, Rambus instead attempted to cover and include the

SDRAM standard into its already existing patent landscape.

71.     In a June 18, 1992 draft of the Rambus 1992-1997 Business Plan,

Rambus' CEO, Geoff Tate, laid out the scheme:

> For about 2+ years a JEDEC committee has been working on
> the specifications for a Synchronous Dram.  No standard has
> yet been approved by JEDEC.  Our expectation is a standard
> will not be reached until end of 1992 at the earliest . . . .
>
> [W]e believe that Sync DRAMs infringe on some claims in
> our filed patents; and that there are additional claims we can
> file for our patents that cover features of Sync DRAMs.  <u>Then
> we will be in position to request patent licensing (fees and
> royalties) from any manufacturer of Sync DRAMs</u>.  Our
> action plan is to determine the exact claims and file the
> additional claims by the end of Q3/92.  Then to advise Sync
> DRAM manufacturers in Q4/92.

(emphasis added)

72.     Aside from changes in timing, Tate's plan preceded apace.  In March

1992, Rambus filed several piggy-back patent applications to the '898 application to

ensure its own patents would include the features of the underlying architecture

required to manufacture JEDEC compliant SDRAM and DDR.  One hundred and

eleven of the patent applications in the '898 family contained the same specification

and drawings as were contained in the '898 application itself.

73.     In May 1992, Richard Crisp, a Rambus executive who had also attended

JEDEC committee meetings, met with Vincent, to expand the scope of the '898

application and to draft new claims that would cover certain technologies adopted as the

JEDEC compliant SDRAM standard.

74.     In a final draft of the same Rambus Business Plan, dated July 1992, Tate

detailed Rambus' scheme:

> Rambus expects that patents will be issued largely as filed
> and that companies will not be able to develop Rambus-
> compatible or Rambus-like technology without infringing on
> multiple fundamental claims of the patents . . . Rambus'
> patents are likely to have significant applications other than
> for the Rambus Interface.

75.     Tate also wrote:  "Sync DRAMs infringe claims in Rambus' filed patents

and other claims that Rambus will <u>file in updates</u> later in 1992."  (emphasis added).

76.     In June and July 1992, members of the JC-42.3 subcommittee, including

Rambus, voted on whether the SDRAM standards should include a programmable

mode register to set CAS latency and burst length.  The ballot asked the representative

of each voting member whether he or she was award of any relevant patents.  The ballot

further asked voting members who were against the proposal to explain their

justification and asked specifically about any patent issues that were the basis of their

opposition.

77.     IBM voted against the proposal because of its concerns there were

outstanding patent issues that needed to be resolved.  Rambus also voted against the

proposal.  Unlike IBM, however, Rambus omitted reference to its patents and instead cited technical concerns as the basis for its position.

78.   In November 1992, Crisp followed up with Vincent regarding the claim amendments.  A December 1992 Rambus planning document references getting a copy of the SDRAM specifications and cross-referencing it to ensure Rambus identified the features it needed to have its patents cover to ensure manufacturers of SDRAM infringed.

79.   That same month, Crisp and Rambus President David Mooring attended a JC-42.3 meeting in Forth Lauderdale, Florida.  During the meeting, Committee Chairman Jim Townsend made a presentation concerning the EIA patent policy and draft revisions to the JEDEC manual pertaining to patent policy.  Among other things, the language contained in the presentation materials stated that the patent policy applied to situations involving the discovery of patents that may be required for the use of a patent subsequent to its adoption.  The presentation materials also made repeated reference to the need to make disclosure of "patented or patentable items."

80.   By February 1993, per Crisp's instructions, Rambus worked on adding claims relating to programmable latency and on-chip PLL/DLL to the rapidly expanding '898 patent.  Since 1993, both technologies, in addition to data acceleration and burst length technologies, had been incorporated into the JEDEC standards for computer memory.

81.   In September 1994, JEDEC participants made formal presentations relating to SDRAM.  Crisp attended this meeting.  Although Crisp knew Rambus was

pursuing patent claims that would apply to the proposed SDRAM standards, he omitted

to disclose any patents and or patent applications during this meeting.

82.     Despite the widespread expectation among JEDEC members that

company representatives would disclose potentially relevant actual and prospective

intellectual property claims if they wished to preserve their ability to enforce their

intellectual property against JEDEC-compliant products, Rambus elected not to

disclose those applications with the intent to defraud JEDEC, its members, and those

(such as NVIDIA) relying upon the openness of the standards, into believing that

Rambus did not have any actual or potential blocking patent rights on proposed or

adopted SDRAM standards.

83.     Because of Rambus' conduct, JEDEC was not put on notice that Rambus'

intellectual property might extend to SDRAM standards that were under discussion.

Instead, Rambus intentionally failed to disclose its plan to obtain and assert patents over

JEDEC-compliant SDRAMs so that it could leverage its patents against manufacturers

of memory and electronic products.

**JEDEC's Adoption of a SDRAM Standard**

84.     In March 1993, JC-42.3 voted to send its proposed SDRAM standards,

which included both programmable latency and burst length, to the JEDEC council for

approval.

85.     On May 24, 1993, JEDEC formally adopted the SDRAM standard, which

incorporated two technologies that Rambus claims its patents covered – programmable

CAS latency and programmable burst length.

86.     After the SDRAM standards were adopted, JC-42.3 began work on the next generation of on-chip PLL/DLL technology for later generation SDRAM, which became known as DDR SDRAM.  During this time, Rambus continued to amend its patent applications to cover JEDEC-compliant products.  Throughout 1994, Rambus CEO Tate monitored the progress of Rambus' patent activity as it continued to work on amending its applications to focus on future SDRAMs such as DDR.  Although Crisp knew that Rambus had been pursuing patent claims covering on-chip PLL, he omitted to disclose any patents or patent applications to JEDEC committees.

87.     As underscored elsewhere in this complaint, despite its duty to do so, Rambus never disclosed to JEDEC the fact that, throughout the duration of its membership in the organization, Rambus had on file with the PTO and was actively prosecuting, patent applications that, in its view, either covered or could easily be amended to cover, elements of the existing and future SDRAM standards.  Rambus never said or did anything to alert JEDEC to (1) Rambus' belief that it could claim rights to certain technological features not only when used in the context of its proprietary, narrow-bus, RDRAM designs, but also when used in the traditional wide-bus architecture that was the focus of JEDEC's SDRAM standard-setting activities; or (2) the fact that Rambus, while a member of JEDEC, was actively working to perfect such patent rights.

88.     On the contrary, Rambus' very participation in JEDEC, coupled with its failure to make required patent-related disclosures, conveyed a materially false and misleading impression—namely, that JEDEC, by incorporating into its SDRAM

standards technologies openly discussed and considered during Rambus' tenure in the organization, was not at risk of adopting standards that Rambus could later claim to infringe upon its patents.

89.     Indeed, on at least two occasions during Rambus' involvement with JEDEC, Crisp was asked by JEDEC representatives whether Rambus had any patent-related disclosures to make pertaining to technologies discussed within JC-42.3.  In neither instance did Rambus make the required disclosures.

**Rambus' Withdrawal From JEDEC**

90.     At some point in December 1995, Rambus' in-house and outside counsel discussed the FTC's recently released consent order in In re Dell Computer Corporation, File No. 931-0097, 60 Fed. Reg. 57870 (Nov. 22, 1995), which involved allegations of anticompetitive, unilateral conduct occurring within the context of an industry-wide standard setting organization.

91.     Shortly thereafter, in January 1996, Rambus' outside counsel advised Rambus that it should terminate further participation in any standards body, including JEDEC.

92.     On June 17, 1996, Rambus sent JEDEC a letter detailing that it would not be renewing its membership in the various JEDEC committees and subcommittees, including the SDRAM committee.  This letter included a list of Rambus U.S. and foreign patents and stated that Rambus had also applied for a number of additional patents to protect its technology.

93.    In the letter, Rambus disclosed 23 issued U.S. patents, 21 of which were U.S. and two of which were foreign.  Of these 23 patents, five claimed priority to Rambus' original '898 Applications; and 16 did not claim priority.  In this exit letter, however, Rambus failed to disclose one particular '898 piggy-back patent issued in April 1996.  This non-disclosed patent is alleged to cover the architecture in JEDEC complaint SDRAM and DDR technologies.

**Adoption of DDR Technology**

94.    Though no longer a member of JEDEC, Rambus continued to receive information regarding JEDEC's activities through at least three informants, who leaked information about committee meetings.

95.    By 1995, JEDEC-complaint SDRAM had begun to replace older-generation, asynchronous DRAM architectures.  By March 1998, a DDR SDRAM standard incorporating all four of the technologies that Rambus claims are covered by its patents was approved by JC-42.3.  Total worldwide sales of JEDEC-complaint SDRAM, on a revenue basis, exceeded sales of asynchronous memory.

96.    In August 1999, JEDEC approved the standard and published it.  Rambus waited until November of that year—after consumers and manufacturers were "locked in" to the technology—to reveal its SDRAM and DDR related patents.

97.    As of July 11, 2008, Rambus has received 49 United States patents from continuation and divisional applications claiming priority to the original '898 application with one additional continuation patents pending and six previously issued patents currently under reexamination.

98.     As recently as last week, the Patent and Trademark Office, doubting the validity of Rambus' patents, recently rejected half of the patents at issue in one of Rambus' many lawsuits against a memory manufacturer.

99.     Although Rambus' original '898 parent patent is almost 20-years old, continuous harm caused by its spawn has been inflicted upon companies down the line of production of DRAM products; indeed, the progeny patents have been used by Rambus to "license" manufacturers and end product users into fiscal submission under threat of litigation.

100.    Rambus has sued at least two manufacturers of semiconductor memory devices for infringement of four patents, each of which claim priority to the '898 application, the written description of each is substantially identical to that of the '898 application.  Inevitably and unsurprisingly, on July 10, 2008, Rambus filed a patent infringement suit against NVIDIA.  Six of the 17 "infringed" patents listed in Rambus' July 10 complaint are the progeny of the '898 application.

**Rambus Destroys Documents**

101.    Foreseeing the potential repercussions of their, unfortunately, successful plan, Geoff Tate (Rambus' president from 1990 to 1999 and CEO from 1999 to 2005), hired Joel Karp to develop a litigation strategy, including a plan to destroy evidence, specifically designed to undermine claims that Rambus' patents were wrongfully obtained.

102.    In March 1998, Karp presented a strategy to the Rambus Board, outlining plans (1) to commence litigation within four to six months after sending out a demand

letter, and (2) to implement a document retention policy.  In a presentation to executives, Karp indicated an intention to go into "stealth mode" to allow companies to become heavily invested in production before bringing suit.

103.   On September 3, 1998, Rambus commenced its first "shred party." During this first shred party, Rambus began to "cleanse" its patent prosecution and related files by destroying documents related to, at least, patents that Rambus was planning to enforce against the DRAM industry.  The destroyed documents related to, among others, patents to which other Rambus patents claim priority, including patents that issued after the first shred party.  Rambus knew or should have known that this evidence would be relevant to reasonably foreseeable litigation.

104.   During April 1999, Rambus had its patent attorneys cleanse their files. Four months later, Rambus commenced its second "shred party", destroying additional documents related to patents that Rambus was planning to enforce or litigate against the DRAM industry.

105.   By early 1999, Karp had authored a document indicating that Rambus had already prepared claims charts against various companies, including Micron, Fujitsu, and created benchmarks for negotiating royalties.  By October of that year, the Board was presented with a list of potential "targets" for further patent violation cases to be brought by Rambus.

106.   Although Rambus was contacted in Spring 2000 by outside counsel that it had a duty to preserve all documents related to its DRAM patents and/or litigation against DRAM manufacturers, Rambus once again asked its patent attorneys to destroy

patent documents.  By December of that year, Rambus commenced a third "shred party".

107.    In a 2004 decision in <u>Rambus v. Infineon Technologies AG</u>, Judge Payne of the U.S. District Court for the Eastern District of Virginia compelled Rambus to produce additional documents under the crime/fraud exception, noting that the exception extends to materials and or communications created in planning, or in furtherance of spoliation of evidence.

108.    The court also found that Rambus' intentional destruction of documents was an integral part of its licensing and litigation strategy.

109.    In <u>Samsung v. Rambus</u>, the same court concluded that Rambus had engaged in spoliation of evidence by destroying documents likely to be relevant at the time when Rambus anticipated or reasonably should have anticipated litigation.  Ruling in the context of Samsung's motion for an award of attorney's fees, the court found that Rambus planned for litigation throughout 1998 and 1999 and "as part of the plan . . . implemented a pervasive document destruction program" that targeted "discoverable document."  <u>Samsung Elects. Co. v Rambus Inc.</u>, No. 3:05-cv-00406-REP, 2006 WL 2038417, *42 (E.D. Va. July 18, 2006).

110.    Rambus's intentional destruction of documents to cover-up and hide its deceptive behavior in extorting companies and deceiving JEDEC demonstrate that any derivative, progeny patent gained from the '898 patent was gained through unclean hands.

**Rambus Engages in Unlawful Licensing Schemes**

111. By late 1999, Rambus began contacting all major DRAM and chipset manufacturers worldwide asserting that, by virtue of their manufacture, sale, or use of JEDEC-complaint SDRAM, they were infringing upon Rambus' patent rights, and inviting them to contact Rambus for the purpose of promptly resolving the issue.

112. Rambus has licensed the unlawfully obtained patents regarding DDR technology to synchronous DRAM manufacturers and to manufacturers of chips, even when the chips and DRAM services are used as an integrated unit. Many of these DRAM manufacturers sell their memory to NVIDIA.

113. Rambus entered into license agreements with seven major DRAM manufacturers: Matsushita Electric Industrial Co., Ltd.; Elphida Memory, Inc.; Samsung Electronics Co.; NEC Corporation; Toshiba America Inc.; Oki Electric Industry Co.; and Mitsubishi Electronics America Inc. Rambus allowed each company to use those aspects of its technology necessary for the design and manufacture of JEDEC-complaint SDRAM. In exchange, each company agreed to pay Rambus ongoing royalties associated with their compatibility with the DDR, DDR2, and DDR3 standard.

114. After disclosing its patents, Rambus stated publicly that it would demand even higher royalties from any DRAM manufacturer that refused to license the Rambus patents and instead chose to litigate. Rambus also publicly threatened that it might simply refuse to license its patents to any DRAM manufacturer that was unsuccessful in

litigation.  Rambus' licenses now cover roughly 50% of the synchronous DRAM
industry.

115.    Rambus has reaped the bounty of these extortionate plans by litigating
against several of those same manufacturers with whom it entered licensing
agreements.  Indeed, four of the progeny patents cited in Rambus' July 10, 2008
complaint have been at issue in litigations against Micron Technology (2006) and
Hynix Semiconductor, Inc. (2005).  Rambus now seeks to expand the scope of its
extortionate infringement litigation to companies that merely incorporate, not
manufacture, DRAM memory devices, including NVIDIA.

**Rambus Interactions With NVIDIA**

116.    Rambus has approached NVIDIA to seek a license and has
contemporaneously threatened litigation.  Rambus' proposal offers one of two choices:
(1) take a worldwide license to all of Rambus' patents at an exorbitant rate based upon
worldwide sales or (2) abandon the JEDEC standard compliance and adopt Rambus'
failed interface technology.  NVIDIA has repeatedly told Rambus that its technology is
inferior and would not permit NVIDIA to compete in the highly competitive
marketplace of graphics processing units.  NVIDIA has also made clear that a
worldwide license to the entirety of Rambus portfolio requires payment for scores of
patents and products that could not be covered under any conceivable legal theory.
Nevertheless, Rambus persists in its efforts to drag NVIDIA into its extortionate
scheme.

117.    As a direct result of Rambus's behavior, NVIDIA was and will continue to be injured in that it will have to pay royalties imposed by Rambus on device manufacturers, which costs will be passed along and incorporated in the supra-competitive prices that NVIDIA's customers will pay for products incorporating DRAM technology.

<u>**COUNT ONE**</u>

**(Monopolization and Attempted Monopolization under the Sherman Act, 15 U.S.C. § 2)**

118.    NVIDIA realleges each allegation set forth in Paragraphs 1 through 117, inclusive, and incorporates them by reference herein.

119.    NVIDIA seeks damages and injunctive relief against Rambus by reason of Rambus' monopolization and attempted monopolization of the SDRAM, DDR, DDR2 and DDR3 markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

120.    Rambus has, through its willful, fraudulent and deceptive conduct in front of JEDEC, isolated any other producer of DDR technology from obtaining or in any other way using DDR technology without paying or being subjected to infringement actions from Rambus.  Accordingly, Rambus has garnered unto itself possession of monopoly power within the market for DDR and SDRAM technology.

121.    Through its misrepresentations and omissions to JEDEC, Rambus manipulated the standard-setting process for DDR technology.

122.    Rambus' behavior is conducted with the specific intent of achieving monopoly power of DDR technology.

123. Rambus' behavior, as a patent holder of DDR2 and DDR3 technology, has had and will continue to have a substantial effect on interstate commerce.

124. As a direct result of Rambus' behavior, NVIDIA has been injured in its business and property in an amount that has yet to be determined but will be established at trial.

125. Unless Rambus is enjoined by a court of law, its conduct will continue to injure and irreparably damage NVIDIA. Because NVIDIA's manufacturing base is dependent on DDR technology, Rambus' abuse of its wrongfully gained patents will continue to force NVIDIA to buy XDR technology from Rambus or pay Rambus' dubiously inflated DDR technology royalties. As a result, the market for DDR itself has been artificially inflated which was precisely the end result of Rambus' concerted efforts in front of JEDEC.

126. NVIDIA has no adequate remedy at law for Rambus' continuing violations of its rights.

## COUNT TWO

### (Antitrust Violations Under North Carolina Law)

127. NVIDIA realleges each allegation set forth in Paragraphs 1 through 126, inclusive, and incorporates them by reference herein.

128. NVIDIA seeks to enjoin Rambus from violating any further the antitrust laws of North Carolina in future anti-competitive practices under.

129.   Rambus has violated North Carolina North Carolina General Statute § 75-2 with respect to certain technologies related to DDR, DDR2 and DDR3 technological features.

130.   As noted above, Rambus has, through its efforts to create a monopoly and through its extortionate licensing practices, has conspired to restrain trade by preventing the free flow of commerce with regard to DDR technology.

131.   NVIDIA has been damaged by reason of Rambus' alleged violation of the above statute and is thus entitled to treble damages based on whatever this court shall decide is the monetary injury suffered.

## COUNT THREE

**(Unfair and Deceptive Acts Affecting Commerce
Under North Carolina General Statutes § 75-1.1)**

132.   NVIDIA realleges each allegation set forth in Paragraphs 1 through 131, inclusive, and incorporates them by reference herein.

133.   By reason of the acts and conduct described above, Rambus has engaged in unfair and deceptive trade practices.  Rambus' conduct violates established public policy of North Carolina and other states.   Rambus' conduct is immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers, and substantial aggravating circumstances have accompanied  conduct.  Rambus also have engaged in deceptive acts and practices, having engaged in conduct that has the capacity or tendency to deceive.

134.    Rambus' conduct constitutes unfair  and deceptive acts or practices in and affecting commerce within the meaning of N.C. Gen. Stat. § 75-1.1, and within the meaning of other laws prohibiting such conduct.

135.    Rambus' unfair and deceptive activities have damaged and harmed NVIDIA, are continuing to damage and harm NVIDIA, and, unless restrained, will continue to damage and harm NVIDIA, including causing irreparable injury to NVIDIA's business, reputation and goodwill.

136.    NVIDIA has no adequate remedy at law for Rambus' continuing violation of its rights..

137.    NVIDIA is entitled to a trebling of its damages and an award of attorneys' fees pursuant to N.C. Gen. Stat. § 75-16 and N.C. Gen. Stat. 75-16.1

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff NVIDIA Corporation hereby demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff NVIDIA prays for relief as follows:

(a)    That this Court declare that Rambus has attempted to monopolize and has monopolized the United States market for DDR technology in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(b)    That the Court preliminarily and permanently enjoin Rambus from monopolizing and attempting to monopolize the United States market for DDR technology under Section 16 of the Clayton Act, 15 U.S.C. § 16;

(c)     That the Court preliminarily and permanently enjoin Rambus from all conspiracies and contracts in restraint of trade in connection to and with NVIDIA;

(d)     That the Court award Plaintiff NVIDIA compensatory damages as a consequence of Rambus' conduct in an amount to be determined and trebled, as provided by Section 4 of the Clayton Act, 15 U.S.C. § 15 and N.C. Stat. Gen. § 75.16;

(e)     That the Court award Plaintiff NVIDIA any other remedies to which it may be entitled, including all remedies provided for in 15 U.S.C. § 15 and under state law;

(f)     That the Court award Plaintiff NVIDIA all other costs and disbursements of this action, including reasonable attorneys' fees, pursuant to 15 U.S.C. § 15;

(g)     That Rambus' actions be adjudged unfair and deceptive trade practices in violation of N.C. Gen Stat. § 75-1.1, and Rambus be found liable for three times the amount of damages to NVIDIA, pursuant to N.C. Gen. Stat. § 75-16;

(h)     An award of attorneys' fees and costs incurred in this action, pursuant to N.C. Gen. Stat. § 75-16.1;

(i)     For a jury trial on all issues so triable; and

(j)     For such further relief as the Court deems just, adequate, and necessary.

This the 11th day of July, 2008.

/s/ Robert D. Mason, Jr.
Mark N. Poovey (NC Bar No. 9416)
John F. Morrow, Jr. (NC Bar No. 23382)
Robert D. Mason, Jr. (NC Bar No. 29337)
*Attorneys for Plaintiff NVIDIA Corporation*
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
One West Fourth Street
Winston-Salem, North Carolina  27101
Telephone:  (336) 721-3600
Telephone:  (336) 721-3660
mpoovey@wcsr.com
jmorrow@wcsr.com
rmason@wcsr.com

-and-

J. Peter Coll, Esq.
Karen D. Thompson, Esq.
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York  10103
Telephone:  (212) 506-5000
Facsimile:  (212) 506-5151

I. Neel Chatterjee, Esq.
Sean Lincoln, Esq.
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025-1015
Telephone:  (650) 614-7400
Facsimile:  (650) 614-7401